**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**MARQUELL JONES,**<br><br>**Defendant.** | **Case No. 24-cr-150-2 (LLA)** |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The instant case marks defendant Marquell Jones' third conviction for illegally possessing a firearm. Here, he was in possession of a Glock pistol and a Micro Draco firearm—both equipped with large capacity magazines—in close proximity to a crowded D.C. nightclub. The defendant possessed these weapons a mere four months after completing his sentence for two armed carjackings and while still under court ordered supervision. And he possessed these weapons in connection with the arsenal of his firearms he and his co-defendants were storing in their vehicles on October 19, 2023. The danger these weapons posed to the community cannot be overstated. And just one year later, while still under court ordered supervision, the defendant was arrested for once again illegally possessing a firearm. The defendant's willful disregard for the law and his repeated failure to comply with the terms of court ordered supervision make clear that a sentence of 37 months' incarceration is both necessary and appropriate to protect the community and meet the goals of sentencing. Accordingly, the government respectfully requests that the Court sentence the defendant to 37 months' incarceration followed by a period of three years of supervised release.

## BACKGROUND

In 2023 law enforcement was monitoring the Instagram accounts of a group of men who frequented the Woodland Terrace area of Washington, D.C. These men would often display what

appeared to be firearms and drugs on their public Instagram feeds and in videos posted to YouTube. Marquell Jones was one of these men.

Prior to October 19, 2023, law enforcement observed multiples instances of Mr. Jones in music videos depicting Mr. Jones surrounded by associates in possession of what appeared to be multiple firearms, including Micro Draco AK-47-style pistols and other handguns. Often these pistols had extended magazines which are illegal in the District of Columbia. Law enforcement also observed apparent machinegun conversion devices mounted to Glock-style pistols. The music videos were high quality such that extensive details of the firearms and magazines could be observed. The still images included below are examples from YouTube videos.



Figure 1 - Jones (right) in KP Gretzky - Dangerous Sport (Feat. Situation Slim) [Official visual] | @DirectedByFOUR posted 10/16/23



Figure 2 - Jones (center) in KP Gretzky - Dangerous Sport (Feat. Situation Slim) [Official visual] | @DirectedByFOUR posted 10/16/23




Figure 3 - Situation Slim - SMOKE (Feat. 3coMMa$) [Official Visual] | @DirectedByFOUR posted 10/3/2023



Figure 4 - Situation Slim - Walkin Wit 60 (Official Visual) @DirectedByFOUR posted 8/31/2023

Based on the appearance of these firearms, law enforcement believed that the majority of the firearms depicted above were real firearms. Moreover, it is uncommon for imitation or airsoft weapons to have accessories such as large extended magazines protruding from the magazine well. On the AK-style weapons visible in *Figure 4*, the weapons appeared to be equipped with Magpul aftermarket magazines (consistent with being real rather than imitation). In *Figure 4*, with the exception of the two weapons in the bottom center of the image (marked with a yellow circle), the barrel holes of these weapons are larger in diameter, able to accommodate the diameter of real rather than imitation bullets. By contrast, and similar to those weapons marked with a yellow circle, airsoft weapons will typically have extremely small diameter internal barrel sizes, more consistent with the small pellets typically fired by airsoft guns.

***Possession of Glock 23 Handgun and Romarm/Cugir Micro Draco on October 19 and 20, 2023***

By monitoring the defendants' Instagram feeds, law enforcement determined that these men would be together at Posh Lounge, at 1924 9th Street NW, Washington D.C., on October 19, 2023, celebrating the birthday of Travis Foster. Officers monitored posts by these men, including Jones, across various Instagram accounts on October 19, 2023.[1] As officers monitored social media, they observed a large group of men traveling together, posting and sharing their activities prior to going to Posh Lounge. This included hanging out together in an apartment and going to dinner at Charlie Palmer steakhouse.

Oftentimes when individuals who carry firearms go to places like clubs, they leave their firearms in nearby vehicles as most clubs require patrons to be screened for weapons. Therefore, law enforcement responded to the area around Posh Lounge.

---

[1] Based on the review of multiple posts law enforcement determined that Mr. Jones uses the Instagram handle "heartoflangston."

While outside Posh Lounge, officers observed a group of men, including Mr. Jones, entering the club through security. Law enforcement approached D.C. traffic officers nearby and asked if they knew from where these men had come. One traffic officer directed MPD to the 2100 block of 8th Street NW. There, MPD found a parking garage with multiple parked vehicles. Officers approached the vehicles to determine if they had reason to search any of them.

An officer looked into a black Audi Q7 with Georgia registration and observed on the edge of the driver's seat, a clear plastic bag containing numerous small blue pills (*see* Figure 3 below).[2] Based on the size, shape, and packaging, officers recognized these to be illegal hand-pressed suspected fentanyl pills which are now common in D.C. (*see* Figure 4 below).




<u>Figure 3</u>

[2] Law enforcement later learned that the Audi was stolen from Reagan Airport by means of a fraudulent rental on October 1, 2023. After the events in the parking garage, the status of the vehicle was updated to "stolen" in NCIC (to reflect the fraudulent rental on October 1, 2023) and the vehicle was subsequently recovered the morning of October 23, 2023 at 2677 Douglass Road SE, Washington D.C.



Figure 4

Based on this observation, MPD searched the vehicle. Inside the vehicle, officers recovered 842 suspected fentanyl pills, and three firearms in the glove box (*see* Figure 5 below).



Figure 5

Officers later determined that the Audi had been fraudulently rented using a stolen ID.

Officers also noticed a black Chrysler 300 in the garage with heavily tinted windows and a Florida registration. Officers checked the license plate of the vehicle and learned that this vehicle had been involved in an assault with a dangerous weapon offense on September 20, 2023. There, an unidentified suspect had threated to shoot a woman who was dropping of her child at school and displayed a handgun. During the altercation, the suspect indicated that the vehicle did not belong to him, and the victim photographed the vehicle and tag. An MPD K-9 unit responded to the scene, and a K-9 officer gave a trained indication for the presence of firearms or ammunition in the Chrysler.

Officers opened the vehicle to conduct a search. Under the driver's floor mat, officers located a loaded Glock handgun (*see* Figure 6 below).



Figure 6

Inside the trunk of the Chrysler, officers found a black High Sierra backpack that contained five additional firearms, specifically, two Romarm/Cugir Micro Draco AR-style pistols, a Glock 23 with a suspected machine gun conversion device, a Glock 32 with a suspected machine gun conversion device, and a Glock 27 with a suspected machine gun conversion device. Each of these firearms was loaded. Photographs of the two Romarm/Cugir Micro Draco AR-style pistols are included below (*see* Figures 7 and 8).





Figures 7 and 8

Notably, the Micro Draco firearms are similar in appearance to those previously reflected in YouTube videos involving Mr. Jones. Law enforcement subsequently located an Instagram post from Jones' account with one of Mr. Jones' codefendants, Travis Foster, tagged, which appears to also show the same or similar Micro Draco firearms, and other firearms (*see* Figure 9 below).




Figure 9

Inside the same backpack where the firearms were recovered, officers found CVS prescription paperwork in the name "Travis Foster," including a correct partial date of birth, address, and telephone number (*see* Figure 10 below).




Figure 10

In the same compartment as the prescription paperwork, officers recovered a plastic bag of 5.56 caliber rifle ammunition (*see* Figure 11 below). Law enforcement recovered a total of nine firearms from the Audi and Chrysler.




Figure 11

***<u>"Mission" Music Video and Parking Garage Surveillance Video</u>***

Following this offense, law enforcement observed that the suspects had posted a music video reflecting the events of that evening. Mr. Jones features prominently in that music video. The footage in the music video includes high-quality images from both Charlie Palmer Steak, and inside Posh Lounge October 19, 2023. Mr. Jones is present at both locations.

Law enforcement also recovered surveillance video from the garage where Mr. Jones and his co-defendants parked their vehicles on October 19. Specifically, law enforcement recovered surveillance video that captured Mr. Jones exiting the Audi after the vehicle parked in the garage.

***<u>Subsequent DNA Testing</u>***

Forensic scientists took swabs of all recovered firearms for potential DNA. Additionally, law enforcement obtained a warrant for Mr. Jones' DNA, among other suspects. Forensic examiners at the FBI's Quantico Laboratory developed DNA profiles from the swabs recovered from the firearms and Mr. Jones. With respect to the Glock 23 firearm with serial number CLA001US recovered from the Chrysler, the DNA results were 7.7 octillion times more likely if Mr. Jones and an unknown, unrelated people are contributors than if two unknown, unrelated people are contributors. With respect to the ROMARM/CUGIR MICRO DRACO with serial number ROA 22 PMD-28270 that was recovered from the Chrysler, the DNA results were 1.8 nonillion times more likely if Mr. Jones and three unknown unrelated individuals are contributors than if four unknown, unrelated individuals are contributors.




Figure 12 – The Glock 23 .40 caliber pistol and associated magazine.





Figure 13 – The ROMARM/CUGIR MICRO DRACO and associated magazine.

***March 23 and 24, 2024 Firearm Recoveries***

Law enforcement continued to monitor the defendants' social media accounts, including Mr. Foster's, and on March 23, law enforcement noticed that the same group of men from the October incident were planning on visiting Play DC Lounge. Based on the social media posts, it appeared that the group was driving around prior to the event in a black Chevrolet Suburban.



Figure 14

Notably, as circled in red above (*see* Figure 14), Mr. Foster appeared to be armed, as a

Glock-style extended magazine was protruding from his waistband. Mr. Foster later reposted a story (*see* Figure 14, below) at around 12:15 AM, stating: "We Riding Round wit a whole lotta SHYT." Jones is also visible in these images, including in Figure 14, above, where he is seated in the Chevrolet Suburban (circled in green) and in Figure 15, below, where he is seated on a couch (circled in green).




<u>Figure 15</u>

In another post captioned "Pre game," by a different individual, Mr. Foster (circled in yellow) and Mr. Jones (circled in green) appear in an apartment with two firearms (circled in red) on a couch nearby (*see* Figure 16, below).




Figure 16

MPD officers responded to Play Lounge. At approximately 12:48 AM on March 24, 2024, they observed a black Chevrolet Suburban consistent with the vehicle depicted on social media. They observed five to six men, including Mr. Foster, exiting the vehicle and then entering Play Lounge. Officers conducted a traffic stop of the black Chevrolet Suburban. The driver identified himself as a for-hire driver. As officers spoke with the driver, they observed a handgun in plain view in the rear pocket of the driver's seat. The firearm was identified as a loaded Glock 33 handgun with an extended magazine (*see* Figure 17, below).



Figure 17

Officers searched the vehicle and recovered a second firearm inside a backpack in the rear passenger seat. That firearm was a loaded Glock 19 handgun also equipped with an extended magazine (*see* Figure 18, below).



Figure 18

After the firearms were recovered, the driver of the vehicle received a text from the number 202-594-5069 stating "Yoo . . . Yoo." This number belongs to Travis Foster. Specifically, it was the same number listed on the prescription medication in the name "Travis Foster," with Foster's partial date of birth and address. Additionally, on October 19, 2023, the reservation for the large

group of men, including Mr. Foster, at Charlie Palmer steak, was made under the name "Travis Foster," using this same phone number. The number is registered to Mr. Foster's mother, and the IP addresses associated with Mr. Foster's Instagram posts are associated with this same number.

Forensic examiners at the FBI's Quantico Laboratory developed DNA profiles from swabs of the Glock 33 and the Glock 19 recovered from the Chevrolet Suburban. A mixture of DNA from five or more male individuals was obtained from the swabs of the Glock 33, and therefore, the results were not suitable for further comparison. A mixture of DNA from four individuals (male and female) was obtained from the swabs of the Glock 19. Mr. Foster was excluded as a potential contributor to the DNA on the Glock 19.

Based on this evidence, in June 2025, Mr. Jones was indicted by a grand jury for violating 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of Crime Punishable by a Term of Imprisonment Exceeding One Year) and a warrant was issued for his arrest.

On July 23, 2026, Mr. Jones pled guilty to Count Three of the Third Superseding Indictment charging him with violating 18 U.S.C. § 922(g)(1).

## **ARGUMENT**

Although the Sentencing Guidelines are advisory, under *United States v. Booker*, a sentencing court "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). The Supreme Court has noted that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will

ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed –
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> (i) issued by the Sentencing Commission . . .; and
> (ii) that, . . . are in effect on the date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement –
> (A) issued by the Sentencing Commission . . . and
> (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

But the Sentencing Guidelines are only "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). They "are not the only consideration." *Id.* A sentencing judge "should . . . consider all of the § 3553(a) factors," and "[i]n so doing, . . . may not presume that the Guidelines range is reasonable." *Id.*at 50. "[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines, in cases in which the Guidelines do not fully account for those factors, or when a district court applies

broader § 3553(a) considerations in granting the variance." *United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) (citation and internal quotation marks omitted). In doing so, "the district court can rely on hearsay as evidence for its findings." *United States v. Miller*, 35 F.4th 807, 818 (D.C. Cir. 2022). *See also United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) ("Clear precedent permits hearsay to be used in sentencing decisions."). And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

## **THE APPLICABLE SENTENCING GUIDELINES**

On Count Three, the PSIR estimates the defendant's offense level to be 17 and his criminal history to be category III, yielding a sentencing range of 30 to 37 months' imprisonment. PSIR at ¶ 83. Additionally, the PSIR reflects a Guidelines range for a term of up to three years of supervised release. *Id.* at ¶ 87. The Government agrees with these calculations.

## **THE GOVERNMENT'S SENTENCING RECOMMENDATION**

The Government recommends that the Court sentence the Defendant to 37 months' imprisonment followed by three years of supervised release. This sentence reflects the serious nature of this offense, the Defendant's criminal history and background, and provides adequate deterrence to others in the community.

### **I. The Nature and Circumstances of the Defendant's Offense.**

On October 19, 2023, the defendant possessed two loaded firearms, a Glock pistol and

Micro Draco, both of which were equipped with large capacity magazines. He possessed these weapons while traveling with his co-defendants who had access to a small arsenal of firearms. And he had access to these weapons, one of which was capable of firing rifle rounds, while traveling with his co-defendants throughout the city, including near a busy nightclub.

As a threshold matter, the defendant's possession of loaded semi-automatic weapons was inherently dangerous and placed the community at risk. *See, e.g.*, *United States v. Gassaway*, No. 21-CR-550 (RCL), 2021 WL 4206616, at *3 (D.D.C. Sept. 16, 2021) (collecting cases in this district holding that unlawful firearm possession is dangerous to the public); *United States v. Howard*, No. 20-MJ-181 (BAH), 2020 WL 5642288, at *2–3 (D.D.C. Sept. 21, 2020) (making same observation); *United States v. Cole*, 459 F. Supp. 3d 116, 120 (D.D.C. 2020) (noting that a loaded firearm "has the great potential to escalate into violence"). Although this case does not involve the defendant's use of the recovered firearms, people carry guns because they intend to use them. And while the defendant's crime did not result in any direct violence against another, unlawful firearms possession can lead to dangerous consequences, thereby underscoring the need to take such crimes seriously. This is especially true where, as here, the defendant possessed these firearms near crowded nightclubs.

A loaded firearm is a deadly weapon. It has the ability with a single pull of the action to end a life. A firearm can escalate a mundane disagreement or a petty offense into a deadly encounter. And the reason law enforcement targets the possession of firearms prior to the commission of a crime is because once an individual makes the decision to produce a firearm and pull the trigger, law enforcement is powerless to intervene.

Finally, the firearms the defendant possessed had magazine capacities ranging from 22 to 30 rounds. A firearm with the capacity to unleash over 20 bullets without reloading has the

potential to cause grievous bodily injury (or death) to members of the community, law enforcement, or to the defendant himself. And a gun battle involving firearms with high-capacity magazines exponentially increase the likelihood that such shootings will cause immense loss and suffering to the community. In view of the nature and circumstances of this offense, the requested prison sentence of 37 months' imprisonment is warranted.

## II. <u>The History and Characteristics of the Defendant.</u>

This conviction marks the defendant's third for illegally possessing a firearm and is part of a concerning pattern of criminal conduct involving the use of firearms in the commission of violent crimes. And the defendant committed the instant offense while on supervised release for the commission of two armed carjackings. This criminal history, and the defendant's difficulty complying with prior terms of supervised release, establishes that a meaningful period of incarceration is both appropriate and necessary to punish the defendant for his criminal acts and to protect the community from the defendant's repeated illegal firearms possession.

The defendant's first adult conviction, and first conviction involving the illegal possession of a firearm occurred on April 12, 2016, when the defendant was arrested by members of the Metropolitan Police Department in connection with an armed carjacking. PSIR at ¶ 38. The defendant's convictions in that matter stem from his involvement in two armed carjackings. *See* Exhibit 1, Plea Agreement and Proffer of Facts, 2016 CF3 005456. During the first armed carjacking, the defendant and two other young men carjacked the victim at gunpoint. *See* Exhibit 1 at 5. One of the defendant's codefendants pointed a black firearm at the victim's head and demanded the victim's keys while Mr. Jones and the third codefendant stood around the victim. *Id.* When police located the carjacked vehicle as it was running a red light, officers attempted to stop the vehicle. *Id.* The vehicle refused to stop and fled from police. *Id.* During the pursuit that

followed, the vehicle reached speeds of over 100 miles per hour, ran multiple stop signs and red lights, and drove on the wrong side of the road. *Id.* The pursuit ended when the vehicle crashed. *Id.* Mr. Jones was identified as the driver of the vehicle and was taken into custody. *Id.* Mr. Jones was identified by the victim as one of the suspects who committed the carjacking and admitted to his role in the carjacking during an interview with law enforcement. *Id.*

During the second armed carjacking, Mr. Jones and three other young men carjacked another victim at gun point. *See* Exhibit 1 at 6. Specifically, as the victim was opening the driver's door of their car, Mr. Jones and his codefendants approached the victim. *Id.* One of the men pointed a revolver at the victim's face and demanded that the victim drop his keys. *Id.* Mr. Jones and his codefendants then entered the victim's car and drove away. *Id.* Law enforcement recovered surveillance video of the area where the carjacking occurred and observed Mr. Jones and his codefendants walking in the direction of the victim's vehicle prior to the carjacking. *Id.* Law enforcement lifted latent prints from a temporary tag recovered from the carjacked vehicle and determined that Mr. Jones and one of his codefendants were the source of those prints. *Id.*

After pleading guilty, the defendant was sentenced to 96 months imprisonment and five years of supervised release. *Id.* A mere 16 months after the defendant's release from incarceration, and while the defendant was still on supervised released, the defendant was arrested again and charged with illegally possessing a firearm. *Id.* at ¶ 39. On October 8, 2024, officers with the Prince George's County Police Department conducted a traffic stop on a vehicle with illegally tinted windows. *See* Exhibit 2, C-16-CR-24-002570, Statement of Charges at 5. Mr. Jones was the driver and sole occupant of the vehicle. *Id.* Officers observed Mr. Jones visibly shaking and fumbling with his papers during the stop. *Id.* When police asked Mr. Jones step out of the vehicle, an officer observed a weighted object fall from Mr. Jones waistband to his lower groin. *Id.* The

officer conducted a pat down and felt a firearm. *Id.* Mr. Jones then tensed up and attempted to move his hands toward the firearm. *Id.* Officers detained Mr. Jones and recovered a Glock 30, .45 caliber handgun loaded with one round in the chamber and eleven rounds in the magazine. *Id.* The defendant pled guilty in May 2025 and was sentenced to 5 years imprisonment, 3 years suspended, and 3 years of supervised probation. PSIR at ¶ 39.

The defendant's criminal history demonstrates a concerning pattern of criminal conduct in which the defendant has repeatedly and unlawfully armed himself with a firearm while under court ordered supervision. Just four months after his release from prison in connection with two armed carjackings, the defendant armed himself in this case, even though he knew that he was prohibited by law from possessing firearms. And despite law enforcement seizing the weapons the defendant and his co-defendants possessed in October 2023, the defendant acquired yet another firearm a year later, while he was still under supervision. This criminal history demonstrates an unwillingness to abide by Court ordered supervision, particularly as it relates to the unlawful possession of firearms. Simply put, the defendant's serious criminal history warrants the government's requested sentence at the top of the applicable guidelines range.

**III. <u>The Need for the Sentence Imposed.</u>**

The requested sentence of 37 months' incarceration is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from the defendant for a lengthy period of time. Defendant Jones' criminal history amply demonstrates that he is no stranger to the illegal possession of firearms. Incarceration and court ordered supervision have not deterred the defendant from repeatedly rearming himself. And the defendant has previously made use of illegal firearms to facilitate the commission of two armed carjackings. Thus, nothing short of a lengthy period of incarceration is

sufficient to deter the defendant from continuing this type of behavior. The requested sentence also provides general deterrence: it will signal to the community that the possession of illegal firearms, particularly firearms equipped with large capacity magazines and hopefully deter others from doing so.

This conviction marks the defendant's third for illegally possessing a firearm over the past decade. Two of these convictions occurred within the past three years, not long after the defendant's release from prison and while he was still under court ordered supervision. Prior prison sentences, court supervision, and the threat of rearrest have failed to deter the defendant from unlawfully possessing loaded firearms. This criminal history, combined with the defendant's repeated failure to comply with the terms of his supervised release, makes clear that the only way to protect the community and adequately punish the defendant for his conduct is to sentence him to a lengthy prison sentence. The requested sentence of 37 months' incarceration and three years of supervised release is a reasonable one.

## CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 37 months of incarceration followed by three years of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Benjamin Helfand*

Benjamin Helfand
D.C. Bar No. 1658708
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-252-7059
Benjamin.Helfand@usdoj.gov